☑ Original    ☐

CLERK'S OFFICE
A TRUE COPY
Apr 13, 2022
s/ Michael Longley
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Information associated with mwade2@wi.rr.com that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014. | ) ) ) ) |

Case No.   **22-M-409 (SCD)**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      4-27-22 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Stephen C. Dries _____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    4-13-22 10:00 am _____

*Judge's signature*

City and state:    Milwaukee, WI _____      Hon. Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with mwade2@wi.rr.com (the "Account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

## ATTACHMENT B

## Particular Things to be Seized

## I.     Information to be disclosed by Apple Inc. ("Apple")

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.     All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access

Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"),
Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),
Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"),
Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital
Network Numbers ("MSISDN"), International Mobile Subscriber Identities
("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

     c.

     d.     The contents of all instant messages associated with the account from
March 1, 2021, to present, between the account and DSID 10502916954, including
stored or preserved copies of instant messages (including iMessages, SMS messages,
and MMS messages) sent to and from the account (including all draft and deleted
messages), the source and destination account or phone number associated with
each instant message, the date and time at which each instant message was sent,
the size and length of each instant message, the actual IP addresses of the sender
and the recipient of each instant message, and the media, if any, attached to each
instant message.

     e.

     f.

Apple is hereby ordered to disclose the above information to the government
within 10 days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence and/or instrumentalities of violations of 18 U.S.C. § 666 involving Mark Wade and occurring after March 1, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Records and information relating to City of Milwaukee ("City") and State of Wisconsin ("State") elected officials, including any communications with or about City or State elected officials regarding their support of the City development project called One MKE Plaza;

(b) Records and information relating to bribe payments, quid pro quos, or favors with respect to One MKE Plaza;

(c) Records and information relating to One MKE Plaza;

(d) The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

(e) Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

(f) Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

(g) Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

(h) Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Apr 13, 2022
s/ Michael Longley
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with mwade2@wi.rr.com that is stored at premises<br>owned, maintained, controlled, or operated by Apple Inc., a company<br>headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014. | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **22-M-409 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666 | Theft or bribery concerning programs receiving Federal funds. |

The application is based on these facts:

See attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Eric Burns, SA FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone
_____ *(specify reliable electronic means)*.

Date: 4-13-22

_____
*Judge's signature*

City and state: Milwaukee, WI

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Eric Burns, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(I)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with an Apple ID that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.     I have been a Special Agent with the FBI since November 2009. I am currently assigned to an FBI squad which investigates financial crimes, civil rights crimes, and public corruption crimes. During my tenure with the FBI, I have participated in investigations involving the corruption of public officials, to include facilitation payments and kickbacks. I have participated in all aspects of investigations including executing search warrants involving, among other things, the search and seizure of computers, computer equipment, software, and electronically stored information.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of 18 U.S.C. § 666 (the "Specified Federal Offense"), as described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(I)(A), & (c)(I)(A). Specifically, the Court is "a district court of the United States ... that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. The FBI is investigating an ongoing scheme by one or more individuals to corruptly give City of Milwaukee ("City") elected officials items of value in exchange for their support of a controversial City development project called One MKE Plaza. As further detailed below, in March 2021, an FBI Confidential Human Source (CHS) was introduced to MARK WADE, who was described to the FBI CHS as having control over several City elected officials and being close with KALAN HAYWOOD, President of Haywood Group and owner of One MKE Plaza. WADE told the FBI CHS that HAYWOOD was "on his team" and offered to introduce the FBI CHS to HAYWOOD. Shortly thereafter, HAYWOOD began having consensually recorded telephone calls and meetings with the FBI CHS and an FBI Undercover Employee (UCE) regarding One MKE Plaza. Throughout these recorded

telephone calls and meetings, HAYWOOD represented to be well-connected to prominent City elected officials and, at times, offered to facilitate bribe payments to elected officials. As evidenced through the consensually recorded telephone calls and meetings, as well as the approximate 537 contacts – 243 calls and 294 text messages – between WADE and HAYWOOD since March 1, 2021, HAYWOOD communicated with WADE regarding One MKE Plaza and, at times, relayed the conservations he had with the FBI CHS and FBI UCE to WADE. Furthermore, and with respect to the Specified Federal Offense, given the amount of contact between WADE and HAYWOOD, and more specifically the timing of contact, as detailed below, there is probable cause to believe WADE and HAYWOOD communicated regarding efforts to secure support from City elected officials through corrupt means.

7.     By way of background, on or about February 15, 2018, HG Sears, LLC ("HG Sears"), a Haywood Group affiliate, purchased the former Sears store building located at 2100 West North Avenue, Milwaukee, Wisconsin for approximately $1.5 million. In January 2018, HAYWOOD received a $1.65 million bridge/pre-development loan from the Milwaukee Economic Development Corporation (MEDC) to purchase the building. At that time, HAYWOOD indicated he planned to redevelop the building into a multi-use facility. Also in January 2018, then City Department of City Development ("DCD") Commissioner RICHARD "ROCKY" MARCOUX publicly stated that both the Mayor and the Alderman whose district included the site were committed to seeing the property redeveloped.

8.      By March 2019, plans to redevelop One MKE Plaza had evolved from a multi-use facility to an 80-room hotel and conference center. On or about May 7, 2019, the Milwaukee Common Council approved a $4 million loan to HG Sears to help finance the development of One MKE Plaza. At that time, several City officials publicly spoke out against the loan, indicating the financing posed a significant risk to the taxpayers. Additionally, several City officials cited a Comptroller's report that indicated the project was a significant risk and that the City would not recover its investment.

9.      On or about September 17, 2019, the Milwaukee Common Council's Zoning, Neighborhoods, & Development Committee approved an additional $5 million loan to HG Sears, despite the same concerns that the investment posed a risk to taxpayers.

10.     HAYWOOD received half of the $4 million loan to advance the early planning and cleanup of the existing structure at 2100 West North Avenue. The additional $5 million loan was issued to help HAYWOOD secure private loans and investors. The $5 million loan comes through a tax incremental financing (TIF) district, which would use property taxes from the redevelopment to help cover some of the required loan payments. Two separate FBI CHSs reported granting TIF's for hotels was very unusual for the City. Another FBI CHS reported he/she had never heard of any city granting a TIF for a hotel.

11.     In addition to receiving City loans for the development of One MKE Plaza, HAYWOOD previously received loans from the City to redevelop a building

located in downtown Milwaukee into a mixed-use facility. According to an FBI CHS (CHS-1), the building has not yet been completed, which further draws into question why the City approved a loan package for the One MKE Plaza development.

12.     CHS-1 is a City employee who has cooperated with law enforcement on multiple investigations. CHS-1 desires to keep corruption out of City government and is not cooperating in exchange for any special consideration, favorable treatment, or compensation. CHS-1's information has proven to be credible, reliable, and corroborated through media accounts, as well as independently through this investigation. CHS-1 has no criminal history.

13.     In February 2020, CHS-1 provided additional information that MARCOUX was insistent that HAYWOOD secure City funding for the One MKE Plaza project. In addition to helping Haywood Group, MARCOUX reportedly sought to help HAYWOOD personally by securing assistance from MEDC, the same entity that financed the purchase of One MKE Plaza in February 2018, for personal property loans in an effort to avoid foreclosure on the personal properties. CHS-1 advised it was very unusual for someone in MARCOUX's position to seek assistance from the City for an individual's personal loans.

14.     In December 2020, an FBI CHS (CHS-2), who was purporting to be interested in development projects in Milwaukee, was introduced to MARCOUX. CHS-2 has been cooperating with law enforcement for multiple years over multiple investigations. CHS-2 initially began cooperating with law enforcement in an effort

to receive consideration and assistance for CHS-2's son, who had been arrested for drug possession. After CHS-2's son's legal situation was resolved, CHS-2 has continued to assist law enforcement in exchange for compensation. CHS-2's information has been credible, reliable, and corroborated through consensual recordings, as well as independently through this investigation. CHS-2 has one prior adult felony conviction for Vehicle Theft.

15. MARCOUX recommended CHS-2 contact HAYWOOD for assistance and described HAYWOOD as a very ambitious, great developer. MARCOUX told CHS-2 that he would email HAYWOOD and inform HAYWOOD of CHS-2's interest in Milwaukee.

16. On December 22, 2020, CHS-2 participated in a consensually recorded telephone call with HAYWOOD. CHS-2 told HAYWOOD that MARCOUX mentioned HAYWOOD's name as someone CHS-2 should contact regarding development projects in Milwaukee. HAYWOOD described MARCOUX as "his man, his ace."

17. On December 23, 2020, CHS-2 attempted a consensually recorded telephone call with HAYWOOD, but HAYWOOD did not answer.

18. On December 30, 2020, at law enforcement instruction, CHS-2 sent a text message to HAYWOOD indicating a desire to work together.

19. On March 16, 2021, CHS-2 participated in a consensually recorded telephone call with an individual who has since been recruited as an FBI CHS (CHS-3). CHS-3 told CHS-2 that HAYWOOD was somehow able to get the One

MKE Plaza project approved before it went to underwriting. CHS-3 told CHS-2 that people were upset about the One MKE Plaza project because the City financing was approved and signed off on before they had the chance to review the project.

20.     CHS-3 is a licensed attorney who is politically connected in the City. Similar to CHS-1, CHS-3 desires to keep corruption out of City government and is not cooperating in exchange for any special consideration, favorable treatment, or compensation. CHS-3's information has proven to be credible, reliable, and independently corroborated through this investigation. CHS-3 has no criminal history.

21.     According to CHS-3, HAYWOOD and WADE are very close. CHS-3 described WADE as someone that did a lot of business in Milwaukee and knew everyone in town. Additionally, CHS-3 stated WADE had control over several City Council members because WADE helped those Council members get elected. Further, CHS-3 stated if the City Council members WADE had control over were going to do something, they consulted WADE first.

22.     With respect to the One MKE Plaza project, CHS-3 had never heard of any city granting a TIF for a hotel. CHS-3 recalled asking HAYWOOD how he was able to convince the City to give him such a good deal, but HAYWOOD would not tell CHS-3. CHS-3 stated the only person HAYWOOD would share that type of information with was WADE. In March 2021, CHS-3 offered to introduce CHS-2 to WADE.

23.    According to information received by court order from Apple, WADE created an iCloud Account on or about October 21, 2011 under the name Mark Wade (the "Wade iCloud Account"). The Wade iCloud Account is associated with email address mwade2@wi.rr.com, DSID 99011890, telephone number 414-975-0098 (the "0098 Phone Number"), and street address 11030 West Heritage Drive, Milwaukee, Wisconsin 53224. The Wade iCloud Account utilized each of the following services as recently as November 2021: Calendars, iCloud Photos, Contacts, Find My Friends, iCloud Drive, Messages in iCloud, and Safari Browsing History. Some of these services are discussed in more detail below. Apple further identified an iPhone as being associated with the Wade iCloud Account.

24.    According to information received by court order from Apple, HAYWOOD created an iCloud Account on or about July 30, 2017. HAYWOOD utilized several of the same iCloud services as WADE, such as Calendars and iCloud Photos; however, unlike WADE, HAYWOOD was not utilizing the Messages in iCloud service.

25.    On February 4, 2022, your affiant swore to a search warrant for HAYWOOD's iCloud Account for all records and information associated with HAYWOOD's iCloud Account occurring after December 1, 2020. According to information received by search warrant from Apple, HAYWOOD's iCloud Account contained only three iMessages after December 3, 2020, two of which appeared to be test messages initiated by HAYWOOD.

26.     On March 30, 2021, CHS-2 participated in a consensually recorded meeting with CHS-3 and WADE in Milwaukee, Wisconsin. CHS-3 introduced CHS-2 to WADE. CHS-2 told WADE that MARCOUX provided CHS-2 with HAYWOOD's name and that CHS-2 had a brief conversation with HAYWOOD, but further attempts to contact HAYWOOD failed. WADE told CHS-2 that HAYWOOD was "on his team" and offered to introduce CHS-2 to HAYWOOD. WADE further stated he had a meeting set-up with "his team" the following day, March 31, 2021, and would discuss CHS-2 with them. CHS-3 believed the individuals that were on WADE's "team" included HAYWOOD and someone CHS-3 described as a "Muslim guy who lived out of town."

27.     The investigation has revealed the individual CHS-3 described as a "Muslim guy who lived out of town" is believed to be RAHIM ISLAM. In January 2020, ISLAM was charged with several criminal schemes he orchestrated, including engaging in a corrupt fraudulent scheme with a Philadelphia City Councilman, engaging in a corrupt fraudulent scheme with the former president of the Milwaukee Public Schools Board of Directors, and theft and embezzlement from his employer.

28.     On April 1, 2021, CHS-2 participated in a consensually recorded telephone call with WADE at the 0098 Phone Number. WADE told CHS-2 that he spoke with "his team," which included HAYWOOD, the previous night and told HAYWOOD that CHS-2 was someone HAYWOOD should meet. CHS-2 told WADE that he/she wanted to work with someone with an ongoing project. CHS-2 also

stated he/she could potentially provide capital to HAYWOOD due to difficulties HAYWOOD may have in securing funding as a result of recent negative media coverage regarding HAYWOOD. WADE stated he was text messaging HAYWOOD right then to arrange a meeting. Later in the consensually recorded call, WADE stated he received a text message response from HAYWOOD stating HAYWOOD could meet with CHS-2 the following week.

29.     Between March 31, 2021, and April 2, 2021, according to information received by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged 12 text messages at the 0098 Phone Number.

30.     On April 3, 2021, CHS-2 received several text messages from WADE at the 0098 Phone Number regarding dates and times for CHS-2 to meet HAYWOOD. WADE stated, "[t]he above are the days that Kalan has agreed to… let me know what works for you."

31.     On April 3, 2021, CHS-2 participated in a consensually recorded telephone call with WADE at the 0098 Phone Number. CHS-2 stated he/she was available to meet HAYWOOD on April 7, 2021. WADE stated he would text CHS-2 the location of the meeting once HAYWOOD "hit" WADE back. WADE told CHS-2 that he referred to HAYWOOD as his "lil bro" and HAYWOOD referred to WADE as his "big bro." CHS-2 asked WADE if he, as the "big bro," tried to help HAYWOOD. WADE stated he most certainly tried to help HAYWOOD.

32.     On April 4, 2021, according to information received by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged three text messages at the 0098 Phone Number.

33.     On April 7, 2021, CHS-2 participated in a consensually recorded telephone call with WADE at the 0098 Phone Number. During the call, WADE called HAYWOOD to add HAYWOOD to the call with CHS-2. Once all three parties were connected on the call, WADE introduced CHS-2 to HAYWOOD and stated he (WADE) could not attend the meeting scheduled for that evening but could potentially meet up with HAYWOOD and CHS-2 later in the evening. WADE further stated that he would connect with HAYWOOD and CHS-2 to determine if they could do business together.

34.     On April 7, 2021, approximately one hour after the three-way call between WADE, CHS-2, and HAYWOOD, CHS-2 participated in a consensually recorded meeting with HAYWOOD in Milwaukee, Wisconsin. CHS-2 and HAYWOOD discussed, amongst other things, the One MKE Plaza project and CHS-2's potential involvement in the project. During the meeting, HAYWOOD called WADE to ask if WADE was coming, but WADE was unable to join.

35.     Between April 8, 2021, and April 26, 2021, according to information received by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged seven telephone calls at the 0098 Phone Number. Additionally, between April 8, 2021, and April 20, 2021, WADE and a telephone

number subscribed to by HAYWOOD exchanged 23 text messages at the 0098 Phone Number.

36.     On April 26, 2021, CHS-2 participated in a consensually recorded meeting with HAYWOOD in Milwaukee, Wisconsin. HAYWOOD told CHS-2 that when MARCOUX was the DCD Commissioner, everyone in the City had to go through HAYWOOD to get to MARCOUX. HAYWOOD further stated he had many friends on the City Common Council and helped most of them obtain their positions. HAYWOOD also told CHS-2 that when MARCOUX was struggling to get re-confirmed as DCD Commissioner, HAYWOOD helped MARCOUX obtain the extra votes needed to be re-confirmed. HAYWOOD stated that shortly thereafter MARCOUX helped HAYWOOD obtain the approval for the $9 million in City loans for One MKE Plaza.

37.     Also during the April 26, 2021, consensually recorded meeting between CHS-2 and HAYWOOD, HAYWOOD told CHS-2 that WADE and a prominent elected City official were "his guys." HAYWOOD also told CHS-2 that WADE told him CHS-2 was "solid," but that HAYWOOD needed to see for himself. HAYWOOD stated he and WADE had another business partner named RAHIM ISLAM and that ISLAM "gets things done."

38.     On April 29, 2021, at approximately 11:15am, CHS-2 participated in a consensually recorded telephone call with WADE at the 0098 Phone Number. The call lasted approximately 33 minutes. CHS-2 told WADE that he wanted to run something by him because WADE was "part of this deal," referring to One MKE

Plaza. CHS-2 and WADE discussed various issues with a feasibility study for One MKE Plaza that CHS-2 received from HAYWOOD. WADE recommended that he, CHS-2, and HAYWOOD sit down next time CHS-2 was in town to figure out a way forward. WADE further stated he would try to talk to HAYWOOD that day.

39.     On April 29, 2021, according to information received by subpoena from AT&T, at approximately 11:49am, which was approximately one minute after CHS-2 and WADE's consensually recorded telephone call ended, WADE placed one outgoing telephone call to HAYWOOD from the 0098 Phone Number.

40.     On May 19, 2021, CHS-2 participated in a consensually recorded telephone call with HAYWOOD. CHS-2 told HAYWOOD that CHS-2 would like to introduce HAYWOOD to CHS-2's purported business partners. HAYWOOD told CHS-2 he could introduce CHS-2's purported business partners to several prominent and influential individuals in Milwaukee, as well as members of the business community. HAYWOOD stated he would think about what other introductions he could make to CHS-2's purported business partners.

41.     On May 21, 2021, according to information received by subpoena from AT&T, WADE received one telephone call at the 0098 Phone Number, lasting approximately 19 minutes, from a telephone number subscribed to by HAYWOOD. Additionally, between May 25, 2021, and June 21, 2021, WADE and a telephone number subscribed to by HAYWOOD exchanged 36 text messages and 13 telephone calls at the 0098 Phone Number.

42.    On June 22, 2021, CHS-2 introduced CHS-2's purported business partner, which was an FBI Undercover Employee (UCE-1), to HAYWOOD. During a consensually recorded meeting in Milwaukee, Wisconsin, CHS-2, UCE-1, and HAYWOOD discussed the One MKE Plaza project and UCE-1 was introduced to several individuals that HAYWOOD described as influential in the City, including an individual in a prominent political position. During the meeting, HAYWOOD provided UCE-1 with his telephone number and sent UCE-1 an introductory text message for future communication.

43.    On June 23, 2021, according to information received by subpoena from AT&T, WADE sent two text messages to a telephone number subscribed to by HAYWOOD from the 0098 Phone Number.

44.    On June 24, 2021, according to information received by subpoena from AT&T, at approximately 5:20pm CST, WADE placed one outgoing telephone call utilizing the 0098 Phone Number to a telephone number subscribed to by HAYWOOD. The call lasted approximately 18 minutes 30 seconds.

45.    On June 24, 2021, at approximately 5:44pm CST and approximately five minutes after WADE's telephone call with HAYWOOD ended, CHS-2 participated in a consensually recorded telephone call with HAYWOOD. HAYWOOD told CHS-2 that he (HAYWOOD) spoke to WADE about their June 22, 2021 meeting with UCE-1. HAYWOOD wanted reassurance from CHS-2 that both he and WADE had the "green light" to contact UCE-1 directly. CHS-2 agreed.

46.     Between June 30, 2021, and July 3, 2021, according to information received by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged seven text messages at the 0098 Phone Number.

47.     On July 6, 2021, at approximately 12:41pm CST, UCE-1 received a text message from HAYWOOD asking UCE-1 if UCE-1 had time to catch up. HAYWOOD stated, "I've been giving a few things some thought and want to run them by you." UCE-1 responded, in substance and in part, "I will call you in a little while."

48.     On July 6, 2021, according to information received by subpoena from AT&T, between approximately 3:30pm CST and 4:13pm CST, WADE and a telephone number subscribed to by HAYWOOD exchanged seven text messages at the 0098 Phone Number.

49.     On July 6, 2021, at approximately 6:14pm CST, UCE-1 participated in a consensually recorded telephone call with HAYWOOD. HAYWOOD told UCE-1 that he thought it made sense to have UCE-1 visit Milwaukee again in order for UCE-1 to see the City and visit the project site. HAYWOOD stated he would benefit from spending time with UCE-1 and acknowledged UCE-1 did not get to where UCE-1 was by being "straight and regular." UCE-1 told HAYWOOD that UCE-1 was looking to come to Milwaukee the week of July 19, 2021.

50.     On July 7, 2021, according to information received by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged four text messages at the 0098 Phone Number. Additionally, WADE placed one

outgoing telephone call utilizing the 0098 Phone Number to a telephone number subscribed to by HAYWOOD. The call lasted approximately 35 minutes 30 seconds.

51.     On July 12, 2021, UCE-1 sent a text message to HAYWOOD stating a desire meet on Monday, July 19, 2021. HAYWOOD responded, in substance and in part, "Monday July 19th it is... I will have [a prominent elected City official] and one or two others meet us..."

52.     Between July 13, 2021, and July 16, 2021, according to information obtained by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged three text messages and seven telephone calls at the 0098 Phone Number.

53.     On July 19, 2021, UCE-1 and CHS-2 participated in a consensually recorded meeting with HAYWOOD in Milwaukee, Wisconsin. During the meeting, UCE-1, CHS-2, and HAYWOOD met with representatives from MEDC, the same entity that financed the purchase of One MKE Plaza in February 2018. HAYWOOD described MEDC as a quasi-lender for the City, "kind of like the Mayor's own piggy bank." After the meeting with representatives from MEDC, UCE-1, CHS-2, and HAYWOOD had dinner with HAYWOOD's son and a prominent elected City official. UCE-1 asked the prominent elected City official for his cell number so they could talk in the future. The prominent elected City official provided UCE-1 with his personal cell number and stated it was his personal number "so no public record."

54.     On July 21, 2021, according to information received by subpoena from AT&T, WADE placed one outgoing call utilizing the 0098 Phone Number to a telephone number subscribed to by HAYWOOD. The call lasted approximately 40 minutes.

55.     On July 22, 2021, according to information received by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged three text messages at the 0098 Phone Number.

56.     On July 22, 2021, CHS-2 participated in a telephone call with HAYWOOD[1]. HAYWOOD told CHS-2 that WADE did not think it was a good idea to have CHS-2 and UCE-1 meet with HAYWOOD's primary lender, MEDC, but HAYWOOD disagreed and thought it was a good idea to show CHS-2 and UCE-1 where HAYWOOD got his money. Separately, HAYWOOD told CHS-2 that he controlled all the campaign funds to get individuals elected to public office and that WADE was heavily involved in the decision making process to ultimately determine who "they" would financially support.

57.     On July 28, 2021, UCE-1 sent a text message to HAYWOOD at to ask if HAYWOOD was interested in meeting with UCE-1 in Fort Lauderdale, Florida, on August 18, 2021. At approximately 1:09pm CST, HAYWOOD responded, in substance and in part, "I will be there in [sic] August 18th." According to information received by subpoena from AT&T, at approximately 1:09pm CST that same day, WADE received two incoming calls at the 0098 Phone Number from a

---

[1] This particular call was inadvertently not recorded. The content of the call was documented based on CHS-2's recollection of the conversation with HAYWOOD.

number subscribed to by HAYWOOD. Based on the duration of the calls, it appears the calls did not connect. At approximately 1:34pm CST, WADE placed one outgoing call utilizing the 0098 Phone Number to a number subscribed to by HAYWOOD. The call lasted approximately 25 minutes.

58. Between July 30, 2021, and August 8, 2021, according to information obtained by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged five text messages and 15 telephone calls at the 0098 Phone Number.

59. On August 8, 2021, CHS-2 participated in a consensually recorded telephone call with WADE at the 0098 Phone Number. CHS-2 and WADE discussed One MKE Plaza, including WADE's vision for the project. WADE told CHS-2 he wanted to see a hotel, restaurants, entertainment, and an event space. CHS-2 and WADE subsequently discussed financial projections for One MKE Plaza and scenarios in which they would profit off the project. WADE made it clear that everyone needed to work together and suggested having CHS-2, HAYWOOD, and WADE sit down to discuss further. Separately, CHS-2 asked WADE what WADE thought about a certain prominent elected City official running for mayor of Milwaukee. WADE told CHS-2 that he would have a "big play" in who became the next mayor if the current mayor decided not to run again.

60. On August 18, 2021, UCE-1 participated in a consensually recorded meeting with HAYWOOD and HAYWOOD's girlfriend in Fort Lauderdale, Florida. During the meeting, HAYWOOD and UCE-1 discussed the City's political

landscape. HAYWOOD specifically discussed several City Alderpersons, including a current City Alderman who is a Zoning, Neighborhoods, & Development Committee member ("ALDERPERSON A"). According to HAYWOOD, ALDERPERSON A was the Chair of the City's Zoning, Neighborhoods, & Development Committee, so any deal HAYWOOD wanted to do in the City had to go before ALDERPERSON A's Committee. UCE-1 asked HAYWOOD if ALDERPERSON A was someone they should "grease the skids with" and HAYWOOD replied, "definitely." HAYWOOD told UCE-1 that ALDERPERSON A would not talk to just anybody, but that ALDERPERSON A was clearly "playing the game." HAYWOOD stated that $5,000 would not make ALDERPERSON A answer all of UCE-1's calls but would make ALDERPERSON A think "who is that." UCE-1 suggested to HAYWOOD that they do drinks with ALDERPERSON A. HAYWOOD responded that ALDERPERSON A would like that and that ALDERPERSON A would "get it right away."

61.     Also during the August 18, 2021, meeting between UCE-1 and HAYWOOD, HAYWOOD told UCE-1 that he wished UCE-1 was around 36 months ago because MARCOUX, the former DCD Commissioner, would have found a way for UCE-1 to do business through HAYWOOD.

62.     On August 19, 2021, according to information obtained by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged four text messages at the 0098 Phone Number.

63.     On August 24, 2021, at approximately 3:42pm CST and at law enforcement instruction, CHS-2 sent a text message to WADE at the 0098 Phone

Number asking WADE "when is a good time to give you a call?" WADE responded at 3:58pm CST, "Bro I'll be outta this last presentation bout 6:30."

64.    On August 24, 2021, according to information obtained by subpoena from AT&T, at approximately 4:10pm CST and approximately 10 minutes after WADE responded to CHS-2's text message, WADE and a telephone number subscribed to by HAYWOOD had an approximate 33 minute telephone call utilizing the 0098 Phone Number. At approximately 5:07pm CST, WADE and a telephone number subscribed to by HAYWOOD had an approximate 27 minute telephone call utilizing the 0098 Phone Number.

65.    On August 24, 2021, at approximately 7:01pm CST, CHS-2 participated in a consensually recorded telephone call with WADE at the 0098 Phone Number. CHS-2 asked WADE how the meeting went between HAYWOOD and UCE-1 in Florida. WADE provided CHS-2 with a list of "pros" and "cons" regarding the meeting. WADE told CHS-2 that HAYWOOD told him (WADE) that no progress was made on any deals. WADE said he still believed One MKE Plaza would be built, but would like to see a deal between UCE-1 and HAYWOOD. WADE told CHS-2 that HAYWOOD could "get things done in the City." The call ended at approximately 7:19pm CST.

66.    On August 24, 2021, according to information received by subpoena from AT&T, between approximately 7:22pm CST and 7:32pm CST and approximately three minutes after WADE and CHS-2 spoke, WADE and a telephone number subscribed to by HAYWOOD exchanged six telephone calls at the

0098 Phone Number. Based on the duration of the telephone calls, it appears WADE and HAYWOOD attempted to connect several times and finally did so on the fifth and sixth attempts, with the duration of the calls lasting approximately three minutes and 21 minutes, respectively.

67. On September 3, 2021, at approximately 5:48pm CST, CHS-2 participated in a consensually recorded telephone call with HAYWOOD. During the call, HAYWOOD expressed frustration with the lack of progress on getting a deal done with CHS-2 and UCE-1. HAYWOOD told CHS-2 that WADE felt the same way. HAYWOOD told CHS-2 that WADE said HAYWOOD should probably "move on" and that WADE never wanted HAYWOOD to go to Florida to meet with UCE-1.

68. On September 3, 2021, according to information obtained by subpoena from AT&T, at approximately 7:27pm CST, WADE received one incoming call at the 0098 Phone Number from a telephone number subscribed to by HAYWOOD. The call lasted approximately 25 minutes.

69. On September 10, 2021, UCE-1 participated in a consensually recorded telephone call with HAYWOOD. HAYWOOD told UCE-1 that he wanted to make sure UCE-1 had some face-to-face time with an individual who he and "the business community" were garnering support for as the next mayor the next time UCE-1 was in town. HAYWOOD and UCE-1 also briefly discussed ALDERPERSON A and UCE-1 told HAYWOOD to "line up" ALDERPERSON A for when UCE-1 was in town.

70.     On September 10, 2021, according to information received by subpoena from AT&T, after the telephone call between UCE-1 and HAYWOOD, WADE and a telephone number subscribed to by HAYWOOD exchanged two text messages at the 0098 Phone Number. Additionally, WADE and a telephone number subscribed to by HAYWOOD exchanged five telephone calls at the 0098 Phone Number.

71.     On September 22, 2021, at approximately 10:28am CST, UCE-1 sent a text message to HAYWOOD asking if HAYWOOD was available to meet in Milwaukee, Wisconsin, on Monday, October 4, 2021. At approximately 5:02pm CST, HAYWOOD responded to UCE-1, "Yes."

72.     On September 22, 2021, according to information obtained by subpoena from AT&T, at approximately 5:55pm CST, WADE received one text message from a telephone number subscribed to by HAYWOOD at the 0098 Phone Number. At approximately 5:59pm CST, WADE sent one text message to a telephone number subscribed to by HAYWOOD utilizing the 0098 Phone Number.

73.     Between September 24, 2021, and October 3, 2021, according to information received by subpoena from AT&T, WADE and a telephone number subscribed to by HAYWOOD exchanged 19 text messages and 24 telephone calls at the 0098 Phone Number.

74.     On October 4, 2021, UCE-1 participated in a consensually recorded meeting with HAYWOOD in Milwaukee, Wisconsin. During the meeting, UCE-1 asked HAYWOOD if they were meeting with ALDERPERSON A. UCE-1 told HAYWOOD that he brought an envelope of cash for ALDERPERSON A, based on

what HAYWOOD told UCE-1 during their previous conversations. HAYWOOD stated that he would not give ALDERPERSON A the envelope "just yet," but that ALDERPERSON A would take the envelope. HAYWOOD told UCE-1 he needed to call ALDERPERSON A.

75.     According to information received by court order from AT&T, on October 4, 2021, a telephone number subscribed to by HAYWOOD sent two text messages to a telephone number believed to be used by ALDERPERSON A. According to the time stamp of the text messages, HAYWOOD sent these two text messages to the telephone number believed to be used by ALDERPERSON A at approximately 6:03pm CST, which was while UCE-1 and HAYWOOD were together.

76.     Also during the October 4, 2021, meeting between UCE-1 and HAYWOOD, UCE-1 and HAYWOOD discussed financing options for One MKE Plaza. Specifically, HAYWOOD told UCE-1 he needed a $10 million bridge loan to help pay for, amongst other things, pre-construction costs associated with the project. UCE-1 told HAYWOOD that he was not sure if a bridge loan would work because that type of financing was likely inadequate to "clean" UCE-1's money. UCE-1 then walked HAYWOOD through a "hypothetical" example wherein UCE-1 described the process by which UCE-1 laundered money. HAYWOOD acknowledged he understood what UCE-1 was describing and asked UCE-1 if UCE-1's main purpose when entering into a deal was to ensure UCE-1's money came out clean.

HAYWOOD told UCE-1 he would come up with different scenarios for UCE-1 to participate in the One MKE Plaza project and provide them to UCE-1.

77. According to information received by court order from AT&T, on October 5, 2021, a telephone number subscribed to by HAYWOOD received two text messages from a telephone number believed to be used by ALDERPERSON A.

78. On October 5, 2021, CHS-2 participated in a several consensually recorded conversations with HAYWOOD. HAYWOOD provided CHS-2 with a recap of his October 4, 2021, meeting with UCE-1 and further discussed the One MKE Plaza concept. HAYWOOD described the current concept as an entertainment complex that happens to have hotel rooms. In that respect, HAYWOOD told CHS-2 that WADE has been helpful on the entertainment portion of the One MKE Plaza concept.

79. According to information received by court order from AT&T, on October 6, 2021, a telephone number subscribed to by HAYWOOD sent two text messages to a telephone number believed to be used by ALDERPERSON A. Also on October 6, 2021, according to information received by subpoena from AT&T, WADE exchanged five text messages and two telephone calls at the 0098 Phone Number with a telephone number subscribed to by HAYWOOD. Later that same day, HAYWOOD sent a text message to UCE-1 stating, in substance and in part, "[i]f you get a few minutes tomorrow I'd like to connect. Shouldn't take but a few minutes." UCE-1 responded the following day, October 7, 2021, "I will reach out this afternoon."

80.     On October 7, 2021, UCE-1 participated in a consensually recorded telephone call with HAYWOOD. During the call, HAYWOOD began distancing himself from having UCE-1 pay any elected officials. Referring to UCE-1 paying an elected official, HAYWOOD stated, "I can't see a scenario where they are going to be comfortable doing it the way we, you know, whatever." HAYWOOD stated that if he gave UCE-1 the impression ALDERPERSON A was going to be okay with accepting an envelope of cash, then that was his (HAYWOOD's) fault. UCE-1 responded by telling HAYWOOD that UCE-1 was basing the decision to give ALDERPERSON A an envelope of cash off of exactly what HAYWOOD previously told UCE-1 about ALDERPERSON A, referring to UCE-1 and HAYWOOD's meeting on August 18, 2021, in Fort Lauderdale, Florida. UCE-1 reminded HAYWOOD that when UCE-1 asked HAYWOOD who to go to, HAYWOOD told UCE-1 they should go to ALDERPERSON A. HAYWOOD responded, "for sure… I did do that."

81.     On October 7, 2021, according to information received by subpoena from AT&T, after the telephone call between UCE-1 and HAYWOOD, WADE and a telephone number subscribed to by HAYWOOD exchanged two telephone calls at the 0098 Phone Number.

82.     Law enforcement has identified the Wade iCloud Account and seeks to search that account for evidence of the Specified Federal Offense.

83.     From my training and experience, I know that the iCloud is a cloud storage and cloud computing service that Apple provides to its customers and is accessible on their products, including the iPhone. Customers can use the iCloud to

backup information, to include SMS and MMS messages, photos, videos, music, calendars, third-party app data, and purchase history from Apple, that is captured and/or stored on their personal mobile devices.

84.     Based on a review of information received by court order from Apple, the Wade iCloud Account appears to have backed up information that may be relevant to this investigation, including iMessages, as well as SMS and MMS messages.

85.     From my training and experience, I know that Apple customers may use the iCloud to back up their mobile devices, including iPhones, iPads and Macs, as a way to ensure that important information is not lost, as well as a means to save important information that is taking up too much space on their mobile device. It is also a way to ensure that when a mobile device is replaced – either for an upgrade or because a device has been lost, stolen, or damaged, the Apple customer can restore data to the new phone. Relatedly, I understand that items that may have been accidentally or intentionally deleted or otherwise unrecoverable from a device may remain in an iCloud account.

86.     There is probable cause to believe that evidence of the Specified Federal Offense will be found in the Target Account because the evidence gathered to date in the investigation suggests that WADE has been involved in a public corruption scheme and has an iPhone associated with the Target Account. Based on my training and experience, I know that individuals involved in criminal schemes often communicate with others, be it victims, conspirators, or unknowing parties, in

furtherance of their activities. Here, there is probable cause to believe WADE used a cell phone number to communicate with CHS-2, HAYWOOD, and others, and to transmit messages relating to the Specified Federal Offense. There is therefore probable cause to believe that the Target Account will provide evidence, including, but not limited to, communications between WADE and conspirators and/or other unknowing parties.

87.    On October 25, 2021, a preservation request under 18 U.S.C. § 2703(f) was sent to Apple regarding Apple accounts registered under Apple ID mwade2@wi.rr.com.

88.    On January 20, 2022, a preservation extension request under 18 U.S.C. § 2703(f)(2) was sent to Apple regarding Apple accounts registered under email address mwade2@wi.rr.com requesting Apple extend the preservation of materials for an additional 90-day period.

## INFORMATION REGARDING APPLE ID AND iCLOUD[2]

89.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

90.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop

---

[2]    The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelinesus.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.combusiness/docsIiOSSecurityGuide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used

to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.  Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.  App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

91.  Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud

services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

92.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple provided email address (oftenendingin@icloud.com.@me.com.or@mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

93.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "MyApple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address

("IP address") used to register and access the account, and other log files that reflect usage of the account.

94. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the MyApple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

95. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MACaddress"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be

captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

96. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voice mail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

97. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described

above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

98.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

99.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date, and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

100.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

101.    Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

102.    Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

103.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(I)(A) and

2703(c)(I)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

104.    Based on the forgoing, I request that the Court issue the proposed search warrant.

105.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

106.    The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with mwade2@wi.rr.com (the "Account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

# ATTACHMENT B

## Particular Things to be Seized

## I.  Information to be disclosed by Apple Inc. ("Apple")

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.  All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access

Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"),
Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),
Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"),
Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital
Network Numbers ("MSISDN"), International Mobile Subscriber Identities
("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.

d.     The contents of all instant messages associated with the account from
March 1, 2021, to present, between the account and DSID 10502916954, including
stored or preserved copies of instant messages (including iMessages, SMS messages,
and MMS messages) sent to and from the account (including all draft and deleted
messages), the source and destination account or phone number associated with
each instant message, the date and time at which each instant message was sent,
the size and length of each instant message, the actual IP addresses of the sender
and the recipient of each instant message, and the media, if any, attached to each
instant message.

e.

f.

Apple is hereby ordered to disclose the above information to the government
within 10 days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence and/or instrumentalities of violations of 18 U.S.C. § 666 involving Mark Wade and occurring after March 1, 2021, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Records and information relating to City of Milwaukee ("City") and State of Wisconsin ("State") elected officials, including any communications with or about City or State elected officials regarding their support of the City development project called One MKE Plaza;

(b) Records and information relating to bribe payments, quid pro quos, or favors with respect to One MKE Plaza;

(c) Records and information relating to One MKE Plaza;

(d) The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

(e) Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

(f) Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

(g) Evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and

(h) Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.